The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Chapman and the briefs and oral arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as:
 STIPULATIONS
1. At the time of the alleged injury by accident, the parties were subject to and bound by the provisions of the Workers' Compensation Act.
2. The employer-employee relationship existed between defendant-employer and plaintiff.
3. Zurich-American Insurance Company was the carrier on the risk.
In addition, the parties stipulated into evidence an indexed packet of medical records and reports. Furthermore, Form 22 wage charts for plaintiff and a comparable employee and additional medical records were received into evidence. However, the subsequent medical records were not received into evidence for purposes of showing causation.
 ***********
The Full Commission adopts the findings of fact found by the Deputy Commissioner as follows:
 FINDINGS OF FACT
1. Plaintiff, who is thirty-six years old and a high school graduate, began working for defendant-employer approximately two weeks before the incident in question. She was assigned to an automatic packaging machine which packaged wall switch plates manufactured by the company. Her job involved making sure that the hopper stayed full, making up boxes and overseeing the operation of the machine. She would occasionally have to dump out the barrel if the machine failed to do it. If the machine malfunctioned, she was also supposed to learn how to fix it. Her average weekly wage was $338.40. (This amount was arrived at by averaging the average weekly wage she earned during her two weeks of employment with that of a comparable employee for the entire previous year.)
2. Prior to her employment with defendant-employer, plaintiff had had problems with both wrists, having broken both of them by the time she was twelve years old and subsequently spraining her right wrist as a teenager. In April 1993 she fell at home injuring her left arm and shoulder. As a result of that injury, she ultimately underwent surgery to her shoulder for a partial thickness rotator cuff tear and to her elbow for decompression and transposition of her ulnar nerve. She also developed signs of median nerve compression in her left wrist. However, her right arm was not injured in the fall and she was not treated for any problems with her right arm afterwards.
3. On Friday July 29, 1994 as plaintiff was helping the fixer who was working on her machine, she backed up to turn the machine off and tripped over a keg of screws which was in the aisle. She then fell backwards and landed in such a way that she caught much of her weight on her right arm and hand. Immediately following the fall, she experienced pain from the right side of her neck to her right shoulder, elbow, wrist and thumb. Her employer sent her to Quick Care where she was seen that night. The next Monday she went to Dr. Barron, an orthopedic surgeon at The Miller Clinic who had treated her after her left arm injury. He put her in a thumb spica splint and later changed to a different splint. However, he allowed her to work while wearing the splints.
4. Plaintiff returned to work after seeing Dr. Barron on August 1 and was given lighter work to do than her regular job. She performed the light work for approximately two months before being switched back to her regular job. By October her right shoulder was causing her more problems and her wrist was continuing to bother her. Dr. Barron ordered a bone scan which showed diffuse increased uptake in the right wrist area but not a focal area of problem. On October 20, 1994 he noted impingement type problems in the shoulder so he ordered physical therapy. He also referred her to Dr. Boatright, another orthopedic surgeon in the clinic, for evaluation of her right hand and wrist pain.
5. Dr. Boatright examined plaintiff on November 1, 1994 and was of the impression that she had probably sustained a ligamentous injury to her wrist. He ordered an arthrogram, the results of which were not clear from the records. Dr. Barron, who continued to follow her for her shoulder problems, injected the shoulder on November 8.
6. In December plaintiff called the clinic with complaints of neck pain and Dr. Barron referred her to Dr. Hartman, another orthopedic surgeon at The Miller Clinic. He saw her on December 21, 1994 and thought that she had a cervical sprain/strain. Consequently, he recommended conservative treatment.
7. Plaintiff was then treated by three different doctors at The Miller Clinic. Dr. Boatright treated her hand and wrist symptoms, Dr. Barron followed her for her shoulder and Dr. Hartman treated her neck. MRI's were ordered of her wrist and her neck. On January 24, 1995 Dr. Boatright was of the opinion that there was no evidence of significant injury to her wrist and that she would have to live with the remaining symptoms. He released her on that date. However, she saw Dr. Barron and Dr. Hartman with complaints of increased neck pain from having the MRI to her wrist. The cervical spine MRI was basically normal, so Dr. Hartman continued to treat her conservatively for neck problems.
8. On March 3, 1995 plaintiff returned to Dr. Boatright with continued complaints of pain, numbness and tingling in her right wrist and hand. He advised her to use her splint intermittently and prescribed medication for her. She then went back to Dr. Barron on March 9. He did not believe she had a surgical problem with her shoulder but thought she had developed a chronic mild fasciitis type situation. Consequently, he recommended that she see Dr. Demas, a neurologist. Accordingly, Dr. Demas evaluated her on March 25, 1995. His impression was that she had post traumatic mild myofascial pain involving her right neck, shoulder and arm secondary to her fall at work. He did not find any underlying neurologic injury and therefore did not order neurodiagnostic studies. In view of her response to her injuries, he thought she might benefit from a comprehensive chronic pain rehabilitation program.
9. Plaintiff did not undergo a rehabilitation program since defendants had denied liability for her claim. She returned to Dr. Boatright on May 2, 1995. His assessment was that she was having myositis-like discomfort in the thenarmusculature, continued mild carpal tunnel syndrome and diffuse wrist pain of undetermined etiology. He recommended an intensive physical therapy course at that time, but there was no evidence indicating that she underwent it. She did not receive further evaluation for her hand until October 17, 1995 when she saw Dr. Boatright for the last time. At that visit she was displaying some nonpsychologic symptoms. Dr. Boatright did not know quite what to make of her problems but concluded that there was nothing which surgery would help.
10. In the meantime, plaintiff developed a problem with her low back. Although Dr. Hartman treated her until November 1995, she ultimately came under the care of Dr. Adamson, a neurosurgeon, who performed two operations in December 1995 and May 1996 to decompress her L4-5 interspace. However, her low back problems were not causally related to the injury giving rise to this claim.
11. Plaintiff was not treated for hand problems again until July 29, 1996 when she saw Dr. Majors at Charlotte Orthopedic Specialists. His impression was that she probably had myofascial pain syndrome. Since the treatment he would have recommended had been tried without success, he advised her to see Dr. Wheeler, a neurologist. Plaintiff did not see Dr. Wheeler and did not receive further treatment until December 1996 when she went to Dr. McBride. She continued to complain of pain from her right shoulder down to her elbow, tingling in her hand and aching in her right shoulder blade and neck areas. His assessment was that she had an impingement problem with her right shoulder, tendinitis in the elbow, symptoms of carpal tunnel syndrome and cervical and scapular myofascial pain. He tried cortisone injections but they did not provide her with significant relief. Nerve studies were negative. He then referred her to Dr. Gaul for evaluation and Dr. Gaul ordered some additional tests. In February 1997 Dr. McBride recommended surgery for the right elbow and decided to wait for the results of that operation before making a decision regarding any surgery to the shoulder.
12. On March 7, 1997 plaintiff underwent surgery by both Dr. McBride and Dr. Gaul to her elbow and to her wrist. She did well from the wrist surgery and Dr. Gaul released her on June 10, 1997. Dr. McBride continued to follow her regarding her shoulder and ordered an arthrogram which revealed a tear of the anterior superior labrum. Consequently, on June 26 he recommended surgery to repair the shoulder joint.
13. On July 29, 1994 plaintiff sustained an injury by accident arising out of and in the course of her employment with defendant-employer. The fact that she tripped over a keg of screws and fell to the floor constituted an unusual occurrence which interrupted her regular work routine. As a result of this injury by accident, she injured her right shoulder, elbow, wrist and hand. She also developed myofascial pain syndrome in her neck and scapular areas as a result of the injury. The treatment provided at The Miller Clinic, except for that rendered for low back problems, was reasonably necessary to effect a cure and provide her with relief of these injuries as was the treatment at Charlotte Orthopedic Specialists.
14. Plaintiff was unable to work due to this injury from October 26 through November 1, 1994 and from January 30 through February 23, 1995. Although she missed more time from work during the period before March 1995, no medical authorization was provided for the dates not specified. Her physicians released her to light duty work and defendant-employer had suitable work available for her during that time. Plaintiff did return to work sometime in March 1995 for two days and experienced increased symptoms. Dr. Demas then authorized her to be out of work on March 25, 1995. The medical records in evidence do not reveal that she was ever released to return to work in any capacity thereafter. Although Dr. McBride testified that she could have performed light work during the time he treated her before his deposition, there was no evidence that he ever told her that fact. Consequently, plaintiff has proven that she has not been able to work in any capacity since March 25, 1995.
15. Plaintiff has not reached maximum medical improvement with respect to the injury in question.
16. To the extent that defendants denied liability for this claim and refused to pay for plaintiff's medical treatment following the injury, the claim was defended without reasonable grounds. However, there were serious issues regarding medical causation and disability so there were reasonable grounds to otherwise contest the claim.
 ***********
Based upon the findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. On July 29, 1994 plaintiff sustained an injury by accident arising out of and in the course of her employment with defendant-employer. G.S. § 97-2 (6).
2. Plaintiff is entitled to compensation for temporary total disability at the rate of $225.60 per week from October 26 through November 1, 1994, from January 30 through February 23, 1995 and from March 25, 1995 through the date of hearing on July 21, 1995. She is entitled to continuing compensation thereafter for as long as she remains so disabled. G.S. § 97-29.
3. Plaintiff is entitled to have defendants provide all medical compensation arising from this injury by accident. However, she is not entitled to have defendants to provide the treatment for her low back problems which were not causally related to her injury at work. G.S. § 97-2(19); G.S. §97-25.
4. Plaintiff is entitled to have attorney's fees assessed against defendants to the extent that they denied liability for her injury initially. There were no reasonable grounds for the denial. However, she is not entitled to attorney's fees against the rest of the award in that there were reasonable grounds to otherwise contest the claim. G.S. § 97-88.1.
 ***********
Based on the foregoing findings of fact and conclusions of law, the Full Commission affirms the holding of the Deputy Commissioner and enters the following:
 AWARD
1. Defendants shall pay compensation to plaintiff for temporary total disability at the rate of $225.60 per week from October 26 through November 1, 1994, from January 30 through February 23, 1995, from March 25, 1995 through July 21, 1995 and continuing thereafter for as long as she remains so disabled. That portion of this compensation which has accrued shall be paid in a lump sum. This award is also subject to the attorney's fee hereinafter approved.
2. Defendants shall pay all medical expenses incurred by plaintiff as a result of this injury by accident but not those arising from treatment for her low back problems.
3. An attorney's fee in the amount of twenty-five percent of the compensation awarded is approved for plaintiff's counsel. He shall receive a lump sum from the accrued compensation and shall thereafter receive every fourth check.
4. Defendants shall pay an attorney's fee in the amount of $1,000.00 to plaintiff's counsel for their unreasonable denial of the claim.
5. Defendants shall pay the costs.
This the ___ day of March 1998.
 S/ ______________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
S/ ______________ THOMAS J. BOLCH COMMISSIONER
S/ ______________ CHRISTOPHER SCOTT COMMISSIONER
DCS:bjp